Argued and submitted May 23, reversed and remanded for new trial
December 14, 2005

# STATE OF OREGON,
*Respondent,*

*v.*

# ARIEL GOHAN LASARTE,
*Appellant.*

## C012801CR; A118499

125 P3d 33

Monica L. Finch, Deputy Public Defender, argued the cause for appellant. With her on the briefs were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services.

Kaye E. McDonald, Assistant Attorney General, argued the cause for respondent. With her on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Brewer, Chief Judge,* and Armstrong, Judge.

ARMSTRONG, J.

---

* Brewer, C. J., *vice* Ceniceros, S. J.

## ARMSTRONG, J.

Defendant appeals his convictions and sentences for attempted murder with a firearm (ORS 163.115, ORS 161.405, and ORS 161.610), unlawful use of a weapon with a firearm (ORS 166.220 and ORS 161.610), and unauthorized use of a vehicle (ORS 164.135). Those charges arose from an incident in which defendant allegedly tried to shoot and kill his former fiancée. Defendant represented himself at trial. He assigns error to the trial court's acceptance of his waiver of his right to counsel, its failure to have his competency to stand trial evaluated, its failure to merge his convictions for attempted murder and unlawful use of a weapon, and its imposition of departure sentences based on facts neither found by a jury nor admitted by defendant. We hold that defendant did not knowingly waive his right to counsel and reverse and remand.

Whether a defendant adequately waived his right to counsel is a question of law that we review in light of the totality of the circumstances. *State v. Culver*, 198 Or App 267, 269, 108 P3d 104 (2005) (citing *State v. Meyrick*, 313 Or 125, 132, 831 P2d 666 (1992)). Article I, section 11, of the Oregon Constitution guarantees a criminal defendant the right to be represented by counsel.[1] A defendant may waive that right and represent himself but such a waiver "must be a knowing and voluntary one." *Id.* (citing *Meyrick*, 313 Or at 132). The "knowing" component "refers to a defendant's knowledge and *understanding* of the right to counsel." *State v. Meyrick*, 313 Or 125, 132-33 n 8, 831 P2d 666 (1992) (emphasis added). A defendant is said to "understand" his right to counsel if, considering the totality of the circumstances, the record reflects that he "substantially appreciates the material risks of self-representation." *State v. Jackson*, 172 Or App 414, 423, 19 P3d 925 (2001).

A record can reflect that the defendant sufficiently understands the material risks of self-representation in a number of ways. For example, in *Meyrick*, the court held that

---

[1] Specifically, the text of Article I, section 11, provides that, "[i]n all criminal prosecutions, the accused shall have the right to * * * be heard by himself and counsel * * *."

the defendant understood the risks of self-representation because the record established that he had discussed his case with an attorney and the attorney had warned him "that his chances of winning his case without counsel 'were akin to [the attorney's] chances of handling nuclear materials with his bare hands and not being affected.' " *Meyrick*, 313 Or at 135. In addition to a defendant's prior interactions with attorneys, other relevant circumstances include the defendant's age, education, experience, and mental condition. *See id.* at 132-33 n 8 (age, education, and experience); *State v. Taylor*, 146 Or App 238, 245, 933 P2d 350 (1997) (mental condition). The "preferred means of assuring that the defendant understands the risks of self-representation" is "[a] colloquy on the record between the court and the defendant wherein the court, in some fashion, explains the risks of self-representation." *Meyrick*, 318 Or at 133. Although no particular catechism is required, " 'understanding' for *Meyrick* purposes means more than merely being generally aware that there may be unspecified risks but less than knowing all the potential risks." *Jackson*, 172 Or App at 423.

Here, the following colloquy occurred between the court and defendant, who was born in Cuba:

"THE COURT: The first thing we have to deal with is the issue of you allowing your attorney to withdraw. Now, even if I allowed him to do that, I would be appointing him to be a legal advisor, which means he would still sit next to you, you could turn to him and ask him questions.

"THE DEFENDANT: That's fine.

"THE COURT: And the thing is, is that it may be more helpful to you to have him represent you, and I want you to understand that difference. Because if he's your legal advisor, it means it's up to you and you get to rely on him rather than it being his job to run the trial, and he's experienced in that. So if you really thought that through, that you want him to not be your attorney and just be your advisor —

"THE DEFENDANT: I need to represent myself. As everyone is going to see, I understand and learn things. It's happened. My trial is not really—it's more trial, a big trial, and a lot of people involved in my case, a lot of people.

"THE COURT: That would be a reason to have [your appointed counsel] continue because it's a lot of things to —

"THE DEFENDANT: I need to speak it only that can get straight everything. I can use—I don't want speak to involve me. I need people involve by myself.

"THE COURT: Let me ask something here. If I was to allow him to be your legal advisor and not your attorney —

"THE DEFENDANT: Legal advisor.

"THE COURT: This means that all the rules apply to you that you don't know what those are. You may say something and [the prosecutor] may object, and I'm going to have to tell —

"THE DEFENDANT: That's fine. I understand that.

"THE COURT: You accept that?

"THE DEFENDANT: I accept that.

"THE COURT: Have you thought about this for a while, about the idea of representing yourself?

"THE DEFENDANT: I am sure, pretty sure.

"* * * * *

"THE COURT: * * * I've been told by both attorneys you're an intelligent person, and I can see that you are. How much education have you had?

"THE DEFENDANT: I have my degree, ninth grade.

"THE COURT: Ninth grade. Was that in Cuba?

"THE DEFENDANT: Yeah.

"THE COURT: How long have you been in the United States?

"THE DEFENDANT: I have almost seven years.

"THE COURT: What kinds of work have you done since you've been here?

"THE DEFENDANT: A lot of work. I was working like a security. I was working like a bartender. I was working in the corporation was my last job. And the farmers, like in nursery. I do a lot of work.

"THE COURT: Okay. Let's talk about attorneys then. * * * Have you had attorneys represent you in the past?

"THE DEFENDANT: Yes.

"THE COURT: And was it only criminal cases?

"THE DEFENDANT: It was domestic violence.

"THE COURT: Okay. Did you ever have a trial then? Did you ever get to sit next to a trial attorney and see how trial —

"THE DEFENDANT: No.

"THE COURT: So they represented you and you pleaded to that, you pled guilty?

"THE DEFENDANT: No.

"THE COURT: What happened?

"THE DEFENDANT: I pleaded no contest.

"THE COURT: You pled no contest?

"THE DEFENDANT: Yes.

"THE COURT: Apparently there was a civil case. Did you hire an attorney to represent you about some kind of injury.

"THE DEFENDANT: Yeah.

"THE COURT: And what happened with that case?

"THE DEFENDANT: It was a car accident.

"THE COURT: Okay. What happened to the case?

"THE DEFENDANT: With the case?

"THE COURT: Yeah.

"THE DEFENDANT: I have it here. They sent me a check.

"THE COURT: So you won?

"THE DEFENDANT: Yeah.

"THE COURT: Did it happen in a trial or did it —

"THE DEFENDANT: No.

"THE COURT: They settled it?

"THE DEFENDANT: They settled the case. I have the check already with me. I have the money with me.

"THE COURT: That's fine. What I'm trying to figure out is if you've ever had a chance to watch a lawyer do their job.

"THE DEFENDANT: No, I need to do by myself.

"THE COURT: That may be, but I want to know how is it then that you think that you would know how to do what [your appointed counsel's] job is then.

"THE DEFENDANT: Because the thing, I need to speak just me. I can believe—I can't use another person to express what I need to express, to say what I need to say. It's really hard when you do that. Lost time and also you lost the line. I need to do by myself, because I know that things and I can demonstrate. It's a lot of people involved in my case.

"THE COURT: Okay. Let me ask something. Has there been anything that has gone on in this case that you didn't understand when you've come to court in different things?

"THE DEFENDANT: No, I understand everything.

"THE COURT: You understand that?

"THE DEFENDANT: Yes."

Based on that lengthy colloquy, the trial court found that defendant was a person "at least of average intelligence" who felt "adamantly" that he wanted to represent himself and that defendant made a knowing and voluntary waiver. The court also stated that, notwithstanding the fact that defendant's appointed counsel had related to the court some "unusual" inquiries that defendant had made to counsel, "nothing in [my conversation with counsel] makes me feel that you are unable to aid and assist."[2]

■ Without question, the quoted colloquy demonstrated that defendant felt adamantly that he needed to represent himself. Thus, the waiver was voluntary. However, the question we must address is whether the waiver was "knowing";

---

[2] The record does not reflect the substance of those inquiries.

that is, whether the colloquy and the other circumstances apparent in the record show that defendant substantially appreciated the material risks of self-representation. We conclude that they do not.

The only pitfalls of self-representation of which defendant was warned were (1) that an attorney may be "helpful" in managing a large trial and (2) that "all the rules apply to you that you don't know what those are. You may say something and [the prosecutor] may object, and I'm going to have to tell—." By so stating, the court may have been attempting to warn defendant that, as a lay person, his unfamiliarity with the rules of evidence or the rules of criminal procedure could keep him from presenting his case. However, those warnings were cursory in nature and lacking in detail, not unlike the warning that jury trials are "kinda tricky" that we held to be insufficient in *State v. Meyer*, 116 Or App 80, 84-85, 840 P2d 1357 (1992). Furthermore, even if the warnings had been more detailed, trial management and the need for familiarity with evidentiary, procedural, and other rules are not the only—or the most severe—pitfalls that a criminal defendant representing himself might face. Although the court does not have to articulate all, or even a certain number, of the pitfalls, we conclude that further, more detailed warnings were required of the trial court based on the circumstances of this case.

The record demonstrates that this defendant had never participated as a party in a trial—civil or criminal— and, therefore, may not have had the opportunity to observe what a lawyer could do for him at trial. There is no evidence that the attorney who represented defendant up until the morning of trial warned him of the risks of self-representation. English was not defendant's first language, and he had only a ninth grade education. Furthermore, the record reflects that the court was aware that defendant's appointed counsel had some concerns about defendant's mental status, based on what the court characterized as "unusual" inquiries that defendant had made to his counsel. Notwithstanding the fact that it believed defendant able to aid and assist in his own defense, the court remained obligated to conduct a "careful colloquy," mindful of defendant's mental condition. *Taylor*, 146 Or App at 245. Based on those circumstances, we

conclude that this defendant needed to be warned of more than just the difficulty of managing a large trial and the existence of procedural and evidentiary rules.

■ Furthermore, that error was not harmless because we cannot say that there is little likelihood that it affected the verdict. *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (setting forth test for whether error is harmless under the Oregon Constitution). In his closing argument, defendant made the following statement, and then appeared to attempt to give a $5,000 check to the jury:

> "In my way, please. What I'm going to say, I confess I guilty. I don't want to mercy, nothing about that. I want guilty what I make. I am guilty for everything what I do. And this is my life to you. What you know this is, this is a check, 5,000 bucks. Its waiting, waiting for that moment for the answer."

We feel it safe to assume that, had defendant been represented by counsel, his closing argument would not have included a confession. Accordingly, we vacate defendant's convictions and remand for a new trial.

Reversed and remanded for new trial.