588 December 20, 2023 No. 664

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MARTIN ALLEN JOHNSON,
*Defendant-Appellant.*

Washington County Circuit Court
C011654CR; A173046

Eric Butterfield, Judge.

Argued and submitted February 28, 2022.

Rond Chananudech, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Timothy A. Sylwester, Assistant Attorney General, and Michael A. Casper, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Martin Allen Johnson filed the supplemental briefs *pro se*.

Before Ortega, Presiding Judge, and Powers, Judge, and Kamins, Judge.

POWERS, J.

Affirmed.

**POWERS, J.**

Defendant appeals his convictions on eight counts of first-degree murder, ORS 163.107, raising 22 assignments of error in his opening brief and 34 additional assignments of error in his *pro se* supplemental brief. We address below a number of the assignments of error raised in the opening brief, as well as some of the arguments made in the *pro se* supplemental brief to the extent that they address some of the same issues. We reject the remaining assignments of error without discussion. For the reasons set forth below, we affirm.

These convictions occurred after a retrial of defendant following several lengthy appellate processes, which we discuss below. Before describing what occurred at trial, we briefly recount what came before, because many of the assignments of error—particularly those relating to speedy trial and law of the case issues—require an understanding of that earlier context.

## I.   PRIOR PROCEEDINGS

In February 1998, HF, a 15-year-old girl, was murdered. Defendant quickly became a suspect but fled the state; he was not apprehended until about a year later in Florida and was extradited back to Oregon. He was charged with 11 counts of aggravated murder and convicted after a jury trial in August 2001 on eight of those counts and subsequently sentenced to death. The Oregon Supreme Court on automatic and direct review affirmed the convictions and death sentence in *State v. Johnson*, 340 Or 319, 131 P3d 173, *cert den*, 549 US 1079 (2006) (*Johnson I*). In its opinion, the court recounted the state's evidence—that HF had gone to defendant's home in Washington County to play on his computer, that HF's body was found approximately a day later near the mouth of the Columbia River in Clatsop County, that defendant was seen in the area near where HF's body was found shortly before the discovery, and that a bloodstain on the hatchback of defendant's car matched HF's DNA. *Id.* at 321-22. An autopsy of the victim revealed that she had "a significant amount of morphine in her system when she died and that her vaginal cavity contained semen whose DNA

matched defendant's DNA." *Id.* at 322. The pathologist who performed the autopsy opined that HF had died from strangulation. *Id.* at 321.

As pertinent here, the court in *Johnson I* considered, and rejected, defendant's arguments that evidence gained from the searches of his house and his computers should be suppressed. *Id.* at 323-28. The court also considered, and rejected, defendant's argument that prior bad acts evidence should not have been admitted under OEC 404(3). As the court explained, the police investigation had revealed "evidence that defendant habitually preyed on underage girls, taking them to nightclubs, providing them with alcohol and drugs" and engaging in sexual activity with them, including sexually abusing them while they were rendered unconscious by drugs that he had provided to them. *Id.* at 322. Consequently, the state introduced the testimony from those girls that defendant had drugged them, and some of them also testified that "defendant had taken advantage of them sexually while they were under the influence of the drugs that defendant had administered or supplied." *Id.* at 338. The state's theory of admissibility of that evidence, as well as the court's analysis of that theory, is discussed in more detail below when we address law of the case issues.

After defendant's convictions and capital sentence for aggravated murder were affirmed in *Johnson I*, he sought post-conviction relief, advancing multiple claims of inadequate and ineffective assistance of counsel under the state and federal constitutions. The post-conviction trial court, this court in *Johnson v. Premo*, 277 Or App 225, 370 P3d 553 (2016) (*Johnson II*), and ultimately the Oregon Supreme Court in *Johnson v. Premo*, 361 Or 688, 399 P3d 431 (2017) (*Johnson III*), all agreed that defendant had received inadequate assistance of counsel. Most notably, although defendant had said that the victim had died of a drug overdose, *Johnson II*, 277 Or App at 229, *Johnson III*, 361 Or at 706, trial counsel retained an expert witness, a forensic pathologist, who opined that HF had died from drowning and who testified in support of the theory of the case put forth by counsel: The victim had died as a result of defendant

throwing her off a bridge in Clatsop County, and therefore venue was improper in Washington County.[1] *Id.* at 690.

The key question in the post-conviction proceeding was whether trial counsel had made a reasonable tactical decision in pursuing only that theory or whether trial counsel should have retained a toxicologist to follow up on defendant's assertion that the victim had died of a drug overdose. In the post-conviction proceeding, defendant introduced evidence from a forensic pathologist and an anesthesiologist "that HF had a potentially lethal level of morphine in her bloodstream" when she died. *Id.* at 695. In addressing the claim of inadequate assistance of counsel, the court noted that one of "the most crucial facts" at issue in the trial was: "How did the victim die?" *Id.* at 700-01. The court noted that counsel had three possible avenues to explore—whether the victim died of strangulation as the medical examiner opined, whether she died of drowning as the expert retained by the defense opined, or whether she died of a drug overdose as defendant maintained. Importantly, the court observed that none of those theories would have led to a particularly strong defense, explaining that "if the theory was death by strangulation, there was ample evidence that petitioner strangled the victim; if the theory was death by drowning, there was ample evidence that petitioner drowned the victim, albeit not in the county in which the prosecution was commenced; and, if the theory was death by drug overdose, there was ample evidence that petitioner gave the victim the drugs that caused the overdose." *Id.* at 706. The court did, however, note that the drug-overdose theory would at least have supported an argument that the homicide was not committed intentionally. *Id.* at 707. The court therefore concluded that defendant had "demonstrated that counsel's failure to

---

[1] Defendant's first trial occurred before the decision in *State v. Mills*, 354 Or 350, 312 P3d 515 (2013), which overruled a number of cases and held that venue was not a material element of an offense that had to be proven at trial beyond a reasonable doubt. In the post-conviction proceeding in this case, the court characterized the venue defense as "weak," *Johnson III*, 361 Or at 691, 710, providing "no reasonable prospect for acquittal," *id.* at 710, and further observed that it "had the significant drawback of essentially acknowledging that petitioner had committed aggravated murder, and had done so in a particularly callous manner by throwing a youth whom he had sexually assaulted off a bridge." *Id.* The court also recognized that the information that defense counsel had "suggested no defense that had great merit." *Id.*

adequately investigate that defense had a tendency to affect the result of his trial." *Id.* at 711. Consequently, defendant was entitled to a new trial.

## II.  RETRIAL

Shortly after the case was remanded for retrial after defendant's successful post-conviction proceeding, there was a significant change in the law that affected not only the charges against defendant but the sentencing options. The legislature enacted Senate Bill 1013 (2019), removing numerous theories of murder from the aggravated murder statute, ORS 163.095, which includes the death penalty as a potential sentence, and reclassified those theories as first-degree murder under the newly enacted ORS 163.107, which removed the death penalty as a potential sentencing option for the types of murder with which defendant was charged. Under ORS 163.107(2), upon a conviction for first-degree murder, a court shall sentence a defendant to life imprisonment with the possibility of parole after a minimum of 30 years' imprisonment, or the court may sentence a defendant to life imprisonment without the possibility of parole if the court puts on the record its reasons for imposing such a sentence. Thus, that legislative change not only changed the statute under which defendant was charged but also removed the death penalty as a potential sentence.

In light of those amendments, the indictment charging defendant with the murder of HF was amended by interlineation to allege eight counts of first-degree murder: Counts 1 and 2 (murder committed intentionally and personally in the course of and in furtherance of the crimes of first-degree rape and first-degree sexual abuse, ORS 163.107(1)(j)); Counts 3-5 (murder committed intentionally to conceal the identity of the perpetrator of first-degree rape, first-degree sexual abuse, and third-degree rape, ORS 163.107(1)(k)); and Counts 6-8 (murder committed intentionally in an effort to conceal the commission of first-degree rape, first-degree sexual abuse, and third-degree rape, ORS 163.107(1)(k)).

On retrial, the state again pursued the theory that HF died of strangulation, and defendant's theory—consistent

with his approach in the post-conviction case—was that the victim had died of a drug overdose, not strangulation.[2] The court ruled on a variety of pretrial matters, only some of which we describe as they pertain to the issues that we address on appeal. Defendant filed motions to dismiss on speedy trial grounds and because the state failed to preserve evidence, motions to suppress evidence, motions to exclude prior bad acts evidence, and motions concerning the application of the sentencing provisions of ORS 163.107(2).[3] The court denied those motions after considering the substantive legal arguments raised by defendant. Important to this appeal, the court denied the motions concerning prior bad acts evidence and several of the suppression issues after concluding that the law of the case doctrine precluded reconsideration of those issues in light of *Johnson I*. Thus, the parties proceeded to try the case with the understanding that evidence of defendant's prior actions in drugging and sexually assaulting other girls would be admitted into evidence. There was undisputed evidence that defendant had access to liquid morphine, as well as materials related to, and experience in, how to use morphine.

At the beginning of the second trial, the prosecutor explained the state's theory of the case—that defendant gave HF an incapacitating amount of morphine, sexually assaulted her while she was unconscious, intentionally strangled her to death while she was unconscious, then disposed of her body. Defendant's opening statement explained his theory of the case—that HF had died of a morphine overdose, noting that it was undisputed that the amount of morphine in her system was a lethal amount. Acknowledging defendant's history of providing drugs to and having sexual contact with teenage girls, defense counsel's opening statement noted that none of that evidence indicated that

---

[2] We note that, although the state did primarily argue that defendant caused the victim's death by strangulation, in response to defendant's theory of the case, the state also argued during its closing argument that, if the victim died of a drug overdose, the jury could still convict defendant on a theory that he intended to kill her by giving her drugs to overdose. We discuss that matter in more detail below.

[3] Defendant also assigns error to the manner in which the court responded to statements he made before trial indicating that he was considering waiving his right to counsel. We address that matter separately below.

defendant had ever been violent toward them. The opening statement described the strength of the evidence that defendant would provide that the victim had died from a morphine overdose, implied that it was possible that she had taken the morphine deliberately, but ultimately suggested that it was likely that the jury would be able to convict defendant of a lesser-included offense, specifically mentioning sexual offenses, as well mentioning manslaughter, which did not require proof of intentional killing but required proof that a person caused the death of another under circumstances manifesting extreme indifference to the value of human life.

Because none of the assignments of error that we address concern the sufficiency of the evidence against defendant, it is unnecessary to recite a detailed summary of the evidence presented during the retrial. The evidence of the basic underlying facts was similar to that presented at the first trial regarding the victim's disappearance, the discovery of her body, the evidence connecting her disappearance and the disposal of her body to defendant, and defendant's subsequent flight from the state. Some evidentiary issues, however, bear mention. First, several of the state's witnesses that had testified at defendant's first trial were not available to testify at the second trial, and the court admitted their prior testimony as evidence under OEC 804(3)(a).[4] In particular, Dr. Hartshorne, who had performed the autopsy on HF and had opined that she died of strangulation, died in the interim.[5] Defendant argued that admission of Hartshorne's prior testimony would violate defendant's confrontation

---

[4] OEC 804(3) provides, in part:

"The following are not excluded by ORS 40.455 [OEC 802] if the declarant is unavailable as a witness:

"(a) Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

ORS 40.465.

[5] Defendant also challenges the admissibility of the prior testimony of a detective who had died in the interim and whose prior testimony was admitted. However, because defendant did not develop any specific argument on appeal as to why that testimony was not properly admitted, we reject that assignment of error.

rights under the state and federal constitutions, as he had insufficient opportunity to cross-examine Hartshorne on the current theory of defense, *viz.*, that the victim had died of a drug overdose.

Given the nature of the assignments of error we address on appeal, our primary focus is on the forensic evidence, as that is the most significant area of difference between the evidence in the first trial and the evidence on retrial. In addition to the admission of Hartshorne's prior testimony, the state also presented testimony of Dr. Gunson, who was at the time of the autopsy a medical examiner for the state and a colleague of Hartshorne, and who, at Hartshorne's request, had briefly examined HF's body during the autopsy. Gunson believed at the time— and continued to believe at the time of defendant's retrial after reviewing Hartshorne's autopsy report and prior testimony—that Hartshorne had correctly identified the cause of death as strangulation. When asked about the presence of morphine, Gunson explained that, although the total amount in HF's system was high enough to cause death, HF had metabolized nearly 90 percent of it by the time she died, and HF had injuries consistent with strangulation that were inflicted while she was still alive.

Defendant also put on evidence concerning the cause of HF's death. Dr. Vincenzi, a pharmacologist, testified that he had reviewed the toxicology report that was done after the victim's death.[6] He explained that the amount of morphine in HF's blood was significantly greater than the average lethal dose. He also noted that the tests performed were presumptively positive for benzodiazepines, which are minor tranquilizers, as well as marijuana, but that the presence and quantity of those drugs were not confirmed. Vincenzi opined that, although the interaction of morphine with marijuana was not highly significant, the same was not true as for benzodiazepines, which could increase the toxicity of morphine. He believed that HF had ingested the morphine four to six hours before her death but acknowledged that people would usually die more quickly after such

---

[6] As discussed below, by the time of the second trial, the biological materials used to create the report were no longer available.

a large overdose. Another defense witness, Dr. Wigren, a forensic pathologist, also opined that HF had died of a morphine overdose. Wigren articulated his disagreement with the state's evidence that any strangulation had occurred, opining that the injuries to HF's neck were likely the result of the way her body was positioned when she died, or that the injuries occurred when or after her body was thrown from the bridge. He also reviewed HF's medical and mental health records and opined that she may have committed suicide or accidentally overdosed on morphine on her own. There was evidence presented concerning HF's mental health, and evidence that HF's girlfriend had attempted to commit suicide shortly before HF's death. The defense also presented evidence from Dr. Haddix, another forensic pathologist, who testified as to perceived inadequacies in Hartshorne's performance and documentation of the autopsy but did not opine as to the cause of HF's death.

In closing argument, after recounting the evidence, the prosecutor emphasized the evidence of defendant having drugged and sexually assaulted other girls and suggested that defendant had gone a step further in this case because he knew that HF was not interested in having sex with him because she was a lesbian, and therefore he intentionally killed her. The prosecutor emphasized the strength of the state's evidence that the cause of death was strangulation and suggested that defendant's actions after HF's death were consistent with him having intentionally raped and murdered her and not consistent with an accidental overdose.

Defendant's closing argument focused on the evidence that HF had died from a morphine overdose and suggested that what happened was not essentially different than defendant's encounters with other girls that he had befriended, and that defendant's interactions with them, while reprehensible, were not physically violent. Defendant's closing argument emphasized that the state's theory—that defendant had deliberately killed the victim by strangling her—was inconsistent with his past behavior. Noting that it was undisputed that the amount of morphine in the victim's system was a potentially lethal amount, defendant's closing

argument essentially framed the case as whether the state had proved beyond a reasonable doubt that the victim had died of strangulation before the morphine killed her. Defendant's closing argument pointed to evidence that HF had a history not only of drug use but also a suicide attempt. Acknowledging defendant's history of drugging girls, the closing argument reiterated the difference between intentional murder and reckless conduct that could support a manslaughter conviction.

In rebuttal, the state argued that it had not specifically alleged, nor was it required to prove, that HF had died from strangulation. Rather, the state remonstrated that it merely needed to prove that defendant had intentionally caused HF's death and that the question for the jury to answer was whether defendant had intentionally given her a high dose of morphine "that was in all likelihood a lethal dose, and did [defendant] do that on purpose in order to cause her death?" The state noted evidence that defendant had the medical knowledge to understand dosage in addition to his experience drugging other girls. The state contended: "Whether you find the Defendant intentionally caused [HF's] death by drugging her, intentionally caused [HF's] death by strangling her, or intentionally caused [HF's] death by a combination of the two, the fact remains that [defendant] did exactly what he intended to do."

The court then instructed the jury, which returned a verdict of guilty on all eight counts of first-degree murder. The jury returned its verdict on Friday, November 8, 2019, and it was to reconvene the following Wednesday for the sentencing proceedings. The following Tuesday, November 12, defendant filed a motion for a mistrial, which was argued when the proceedings commenced the following day. Defendant requested that the court either grant a mistrial or require the jury to reconvene to deliberate on its guilt-phase verdict so that it could be determined whether the jurors had unanimously agreed on whether the victim died of strangulation or of a drug overdose. More specifically, defendant argued that, because the state added a new theory of the case during its rebuttal argument—that defendant may have intentionally killed the victim via morphine

overdose rather than strangulation—the defense could not have submitted a jury-concurrence instruction in advance because it was unaware that the state would add the new theory at that point. The court denied defendant's motion.

For the sentencing phase of the trial, after arguments from the parties about how to proceed, the court submitted sentencing-enhancement factors to the jury to consider. The court instructed the jury to consider specific sentence-enhancement factors, and the jury returned findings on four factors: that defendant knew or had reason to know of the victim's particular vulnerability, which increased the harm or threat of harm caused by the criminal conduct; that prior sanctions had not deterred defendant from re-offending; that defendant was on supervision for another conviction at the time of the offense; that future efforts to rehabilitate defendant would not be successful; and that there was a need to ensure the security of the public. The court then imposed a sentence of life without parole based on the jury's findings of enhancement factors. Defendant timely appeals.

### III.  ARGUMENTS ON APPEAL

As noted, defendant raises through counsel and by *pro se* supplemental briefing a great number of assignments of error. We have considered each fully, and other than those specifically discussed in the analysis below, we reject them without further discussion. We note that a recurrent theme throughout many of the *pro se* arguments is what defendant perceives as inadequacies in his counsel's legal arguments, as well as defendant's attempts to supplement his own arguments with materials that are not in this record.[7] Those issues and arguments are not suitable for consideration on

---

[7] In his *pro se* brief, defendant asks us to take judicial notice of numerous other cases that he has filed concerning matters related to his conviction, including factual matters raised in those cases. Some of those cases are mentioned in footnotes 9 and 13, below. Although we reference the existence of some of those appeals and the legal arguments that were made in them, we cannot take judicial notice of facts asserted in the files of those cases. *See Thompson v. Telephone & Data Systems Inc.*, 130 Or App 302, 881 P2d 819, *adh'd to as modified on recons*, 132 Or App 103, 107, 888 P2d 16 (1994) (explaining that "there is a distinction between judicially noticing the existence of a court record and noticing the truth of the contents of that record, much less the truth of the contents of a document that happens to be appended to the court record").

direct appeal in a criminal case. *See*, *e.g.*, *State v. Rhodes*, 309 Or App 318, 319 n 1, 481 P3d 412 (2021) ("Ineffective assistance of counsel claims must be raised and resolved under the post-conviction relief procedure established by statute in Oregon and not on direct appeal.").

We begin with the assignments of error that could be potentially dispositive, *viz.*, those that could lead to an outright reversal of defendant's convictions with no need for retrial, because if any of those arguments are successful that would obviate the need to address the remaining issues. Those assignments of error concern the denial of defendant's motion to dismiss the case on constitutional speedy-trial grounds and the denial of his motion to dismiss the case due to the state's failure to preserve forensic evidence.

A.  *Challenges to the Denials of Defendant's Motions to Dismiss*

1.  *Speedy trial*

On appeal, defendant contends that the trial court erred in denying his motion to dismiss for lack of a speedy trial, citing Article I, section 10, of the Oregon Constitution, and the Sixth Amendment to the United States Constitution (although he does not make a separate argument under the federal constitution).[8] Citing *State v. Harberts*, 331 Or 72, 88, 11 P3d 641 (2000), defendant observes that the inquiry under Article I, section 10, involves an assessment of the length of the delay, the reasons for the delay, and the prejudice to the defendant. He notes that, if the length of the delay is "substantially greater than the average, inquiry into the remaining two factors is triggered," *State v. Mende*, 304 Or 18, 23-24, 741 P2d 496 (1987), but if the delay is "manifestly excessive" and "shocks the imagination and conscience," the delay alone is sufficient to establish a violation of Article I, section 10. *State v. Vawter*, 236 Or 85, 96, 386 P2d 915 (1963).

---

[8] Article I, section 10, provides that, "No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation." The Sixth Amendment provides, in part, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]"

Noting that the burden is on the state, defendant argues that the delay in this case was the 20 years between his indictment and his retrial and contends that that length of time is "manifestly excessive" such that the charges against him should have been dismissed because it "shocks the conscience." Defendant cites *United States v. Chase*, 135 F Supp 230, 233 (ND Ill 1955), which was mentioned in *Harberts*, 331 Or at 86, and argues that that case is comparable to his case.

The difficulty with defendant's argument and the comparison to *Chase* is that, unlike in *Chase*, the state did not delay for 20 years before trying defendant. Similarly, this case is not comparable with *Harberts*, which concerned a lengthy delay that occurred pretrial because the state had taken multiple interlocutory appeals of pretrial rulings and where the court rejected the state's argument that "no delay caused by interlocutory appeals may be considered in analyzing a defendant's speedy trial claim under Article I, section 10." 331 Or at 90 (emphasis omitted). That is, those cases are distinguishable from the present case because defendant was tried and convicted within a reasonable time.

To reiterate the timeline, defendant was indicted in 1999, extradited from Florida, then tried and convicted in 2001. On automatic and direct review—there were no interlocutory appeals—the Oregon Supreme Court in *Johnson I* affirmed his convictions in 2006. Thus, there is no way to view the time between 2001 and 2006 as a "delay" by the state in trying defendant. Indeed, it had already tried defendant and obtained a conviction. The same is true for the period of time from 2006, after the judgment of conviction and sentence of death had been affirmed and then after the commencement of the post-conviction proceeding was initiated, until 2013 when the post-conviction court vacated the convictions and sentence. The state cannot be faulted for failing to try defendant between the years of 2001 and 2013: It could not do so because he had already been convicted. To be sure, the state from 2013 to 2017 pursued appeals from the post-conviction court's grant of relief, which were unsuccessful, and that relief ultimately was upheld resulting in a judgment, after which the state was in the position

to try defendant again. In sum, 12 of the 20 years defendant complains of—2001 to 2013—were years when the state had no ability to try or retry him because he already stood convicted of the offenses. *See*, *e.g.*, *State v. Sisneros*, 84 Or App 306, 309, 734 P2d 355, *rev den*, 303 Or 455 (1987) (reasoning that the defendant could not claim denial of a speedy trial on the basis of "the time that elapsed between her conviction in 1980 and the post-conviction court's judgment in 1986" because the state lacked the ability to retry her "until she had sought and received post-conviction relief").

As for the remaining eight years, defendant makes no specific arguments that any portion of that time involved unreasonable delay by the state, and our review of the record reveals no such unreasonable delay. Both the time before 2001, and the time between 2017 when defendant was able to be retried and 2019 when his retrial occurred, mostly involved normal delays addressing pretrial matters in what was—during the vast majority of that time—an aggravated murder prosecution, such as dealing with suppression motions, motions for admission or exclusion of evidence, motions to dismiss, as well as time needed by counsel to prepare for trial. Defendant acknowledges that he effectively consented to the delay that occurred before May 2000. Further, the record establishes that the state was prepared to go to trial in the fall of 2018, which was a year earlier than defense counsel said that the defense could be ready. Thus, the final year between October 2018 and when the trial commenced in October 2019 could not be considered unreasonable delay by the state.

We recognize that the time between 2013 and 2017, when the state was pursuing its appeal from the post-conviction court's ruling, could arguably be attributable to the state under the circumstances. Although we are unaware of any case law that specifically addresses such an issue in the context of a post-conviction appeal, even if we were to assume for the sake of argument that the rationale of *Harberts* applies, that assumption does not help defendant's position. In *Harberts*, the court noted the weak legal justification for one of the state's pretrial appeals and the numerous delays by the state during the appellate process.

331 Or at 91-92. Here, by contrast, nothing in *Johnson II* or *Johnson III* suggests that the state's legal position on appeal was untenable or rested on a weak legal justification; indeed, quite the opposite, even though the state did not ultimately prevail. *See Johnson III*, 361 Or at 700 (observing that "the question whether counsel provided inadequate assistance is a close one"). Moreover, given the amount of appellate litigation surrounding the post-conviction case, we cannot conclude that the state was responsible for any significant delay in completing the appellate process. *See* 329 Or App 606 n 9, 616-17 n 13 (recounting some of the litigation history and related litigation). Thus, because defendant makes no specific argument that the state's reasons for any portion of that delay were not adequate, we reject defendant's speedy trial assignment of error without further discussion.

### 2. *Loss of evidence*

On appeal, defendant argues that the trial court erred in failing to dismiss the case because materials underlying some of the forensic evidence were unavailable to be tested in preparation for the retrial. The primary focus of this argument is that, although the autopsy included a toxicology report that indicated that HF had not only a specific quantity of morphine in her system, but unquantified amounts of benzodiazepines and cannabinoids, the biological materials on which that report was based were no longer available for testing by the defense and thus the defense was unable to quantify the amounts of the other drugs in HF's system at the time of death. Defendant also advances an argument relating to a pipe found on HF's body that was not retained, contending that it might have contained residue of drugs HF consumed. As explained below, the trial court did not err.

Defendant asserts that, because the compulsory process clauses of both Article I, section 11, and the Sixth Amendment, guarantee a defendant the right to access favorable and material exculpatory evidence, the state violated his rights by failing to preserve the relevant evidence taken in 1998 and make it available for his retrial in 2019. The state responds that, under the policy in place before 2009, such materials were routinely discarded after two

years, and that on the facts of this case, defendant cannot show that his compulsory process rights were violated. Both parties acknowledge that *State v. Faunce*, 251 Or App 58, 67, 282 P3d 960 (2012), *rev den*, 353 Or 203 (2013), sets out the applicable analysis, which is the same under both the state and federal constitutions:

> "To establish a due process [or compulsory process] violation resulting from the state's failure to preserve evidence, a defendant need not show that the state acted in bad faith if it 'was apparent before the evidence was destroyed' that the evidence was favorable and was 'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' *State ex rel Juv. Dept. v. Huskey*, 130 Or App 419, 423, 882 P2d 1127 (1994), *rev den*, 320 Or 567 (1995) (quoting *California v. Trombetta*, 467 US 479, 488, 104 S Ct 2528, 81 L Ed 2d 413 (1984) (internal quotation marks omitted)). Favorable evidence for a defendant can be either exculpatory or impeaching. *State v. Deloretto*, 221 Or App 309, 321, 189 P3d 1243 (2008), *rev den*, 346 Or 66 (2009).

> "The requirements are different when the defendant claims that the state failed to preserve merely 'potentially useful' evidence, such as 'evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.' *Arizona v. Youngblood*, 488 US 51, 57, 109 S Ct 333, 102 L Ed 2d 281 (1988). In that event, the defendant must show that the state acted in bad faith. *Id.* at 58. Thus, 'the applicability of the bad-faith requirement in *Youngblood* depend[s] *** on the distinction between "material exculpatory" evidence and "potentially useful" evidence.' *Illinois v. Fisher*, 540 US 544, 549, 124 S Ct 1200, 157 L Ed 2d 1060 (2004)."

(Ellipsis in *Faunce*.)

In this case, defendant first argues that the unavailable evidence had exculpatory value and that it was "readily apparent" before it was destroyed that it was exculpatory, because it was relevant to whether HF died of a drug overdose. We disagree with defendant's argument. The record indicates that the materials were routinely discarded at some time after defendant had been convicted in 2001, and it was discovered during the post-conviction proceeding in

2009 that they were no longer available. As described above, in defendant's original criminal trial, only two theories surrounding HF's death were at issue, whether she died of strangulation or whether she died of drowning. Given those theories, there is no reason to conclude that it would have been "readily apparent" to the state before the materials were discarded that the presence of unquantified amounts of benzodiazepines and cannabinoids in HF's system or her possession of a pipe had any particular significance with respect to the cause of her death.

Defendant argues alternatively that the discarded biological materials were "potentially useful," such that the results of further testing "might have exonerated the defendant," quoting *Youngblood*, 488 US at 57, and that the state destroyed the evidence "in bad faith." Defendant's "bad faith" argument, however, is premised on the assumption that the state "should have known" the potential relevance of other drugs in the victim's body that could have "synergistically affected the morphine in HF's body." The state responds that, because defendant did not argue before the trial court that it had acted in bad faith, we should not consider the argument now.

After reviewing the parties' arguments and the record, we conclude that, even if the argument was preserved for our review, the argument lacks merits for several reasons. First, the trial court found that the state did not act in bad faith, which is reviewed as a question of fact. *See*, *e.g.*, *State v. Walker*, 323 Or App 234, 241-42, 522 P3d 868 (2022) (so stating). Defendant's particular arguments advanced on appeal do not disturb the trial court's finding in that regard. Second, defendant's arguments lack merit, because his contention is essentially the same as one that we described—and rejected—above, *viz.*, that the potential relevance of the evidence should have been obvious. Moreover, defendant provides no legal authority for the assumption underlying his argument that "should have been obvious" equates to "bad faith" as that term is used in this context. *See*, *e.g.*, *Faunce*, 251 Or App at 70 (explaining that "the state's negligence does not amount to bad faith for failing to preserve potentially useful evidence"). Accordingly, we reject defendant's

bad-faith argument and conclude that the trial court did not err in denying the motion to dismiss for failure to preserve exculpatory evidence.

### B.  *Issues Surrounding Self-Representation*

#### 1.  *Background*

In November 2017, shortly after the post-conviction judgment had become final, the trial court established that defense counsel had been appointed but one of those counsel told the court that, although they were appointed by the court and assigned to the case by the Office of Public Defense Services, defendant had not yet asked for counsel. Defendant interjected, "I'm *pro se*, apparently." After a short discussion about whether the judge had a potential conflict, the court asked defendant if he intended to represent himself. Defendant said that he did intend to represent himself and he further explained that appointed counsel had agreed to be standby or legal advisors. When the court asked that defendant be provided with a waiver-of-counsel form, defendant responded, "I'm not prepared to do a waiver of counsel yet because we are going to need longer time, you know, to be advised of risks and dangers ***." The court advised that defendant needed to consider the form and whether he wanted to proceed *pro se*, indicating that it need not be done at that point. The prosecutor interjected, noting that defendant had filed over 90 *pro se* motions in his post-conviction case and suggesting that the court give defendant a week to consider the matter and consult with his appointed counsel before determining how he intended to proceed. Noting that defendant had filed numerous *pro se* motions with the court during the pendency of the post-conviction case, the prosecutor took the position that defendant should not have hybrid representation, *viz.*, being represented by counsel at some points and being *pro se* at others.[9] The trial court set over the case for a week, informing defendant that at the next hearing, "we will have a more complete conversation about

---

[9]  *See, e.g., Johnson v. Premo*, 355 Or 866, 868, 333 P3d 288 (2014) (noting that defendant—then petitioner—had "filed more than 100 *pro se* motions, totaling more than 6,000 single-spaced pages of argument" in the post-conviction trial court while represented by counsel and that he filed numerous *pro se* motions on appeal while represented by counsel, and concluding that he was not entitled to hybrid representation in the course of his post-conviction appeal).

whether or not you want to represent yourself." Defendant suggested that he would need four hours for the upcoming hearing. The court declined to schedule a four-hour hearing, commenting that the hearing "will take as long as I decide it will take."

The following week, which was still in November 2017, the hearing began with defense counsel and the court discussing the right to counsel and waiver of counsel in capital cases (because at that point in time, the charges against defendant were still charges of aggravated murder) and the role that counsel would play if defendant opted to proceed *pro se*. Counsel noted that, under ORS 135.045(1)(c) in a capital case, unlike in most criminal cases, "[t]he court may decline to accept the waiver of counsel if the defendant is charged with a capital offense," and the parties discussed with the court how that statute might comport with the constitutional rights to self-representation. Thereafter, the court asked defendant if he did in fact want to represent himself, and defendant responded that he wished to discuss an email he had sent about disqualifying the judge because defendant intended to call the judge as a witness at trial. The court responded, "We are not going to get to that question until we decide who is representing you." Defendant continued to pursue the topic of removing the judge, discussing whether it would be possible to remove the judge by filing an affidavit and recognizing that there would be a timing problem with doing so.

The court continued to ask defendant if he wished to be represented by counsel. Defendant responded that he had "some questions about my representation for myself." The court indicated that, if defendant was not asking to represent himself at that point, the court was going to proceed with appointed counsel representing him. Defendant said that he was trying to make an informed decision, and the court stated that he had had a week to talk with his lawyers and review the form concerning self-representation. Defendant indicated that he had read the form but had not completed it because he did not believe it was adequate. The court said that the next step was for him to complete the form, and that defendant could have another week to

consult with his lawyers to decide or he could speak with his lawyers in the jury room about it. Defendant told the court, "I would like to be advised of the dangers and risks of representing myself." When asked if he had discussed it with his attorneys, defendant stated that they could not answer all his questions. Defendant reiterated that he had requested a four-hour hearing and stated, "I have 38 questions that I—40 questions I need answered by the Court, for you to please explain the risks and dangers of me representing myself." The court explained that once defendant had completed the form, it would proceed; defendant, however, refused to do so, saying variously that it was incomplete and "not adequate because it doesn't advise me of all the risks and dangers," and that it did not "comply with the law." He argued that "[i]t has to be verbal," and that "[a]ll the case law says it's—you know—you have to advise me." He quoted from *Faretta v. California*, 422 US 806, 835, 95 S Ct 2525, 45 L Ed 2d 562 (1975), that a defendant should be "made aware of the dangers and disadvantages of self-representation" and that a record needed to be made concerning the choice of self-representation.[10] The court concluded it would set over the matter again to allow defendant additional time to discuss the matter with his appointed lawyers.

At the following hearing, which was held in December 2017, the trial court and counsel discussed a proposed schedule for filing various motions, and defense counsel indicated that the dates worked for counsel but that defendant did not agree with the schedule and that he wished to waive future court appearances. Defendant made no verbal responses to the court when asked questions during that hearing; he did, however, indicate through nonverbal responses—such as shaking his head—whether he agreed or disagreed. The court asked defendant whether he discussed the issue with his attorneys, whether he had enough time to discuss the pros and cons of his decision, and whether he wished to waive future appearances, and defendant responded affirmatively to each question with a nonverbal response that the court verbalized as "[h]e's indicating yes."

---

[10] We note that *Faretta* was discussed at length in *State v. Meyrick*, 313 Or 125, 136-38, 831 P3d 666 (1992), on which much of Oregon's case law regarding the dangers of self-representation is based.

The parties then proceeded to discuss scheduling: The state reported that it would be ready to proceed to trial in 10 months, and defense counsel wanted more time, noting that the ABA guidelines for trial preparation in this type of case outlined that two years would be appropriate and that the defense would not be ready to proceed until October 2019.

The next hearing was in February 2019, when defense counsel told the court that defendant still did not wish to be present in court but that he wanted the court to remove his attorneys. The court rescheduled the hearing on that motion to procure defendant's presence. At the rescheduled hearing, counsel told the court that they moved to withdraw based on defendant's request that they not represent him. The court read defendant's written submission, noted that it did not provide reasons why counsel should be removed, then asked defendant directly if he wanted counsel removed. Defendant gave the court equivocal answers, noting that he had not asked for new counsel but wanted to reserve his right to file a motion to remove counsel later, and also telling the court that he believed that the court had already made its decision about his representation. The court clarified that defendant was talking about the hearings where, as the court described, defendant was "unable or unwilling to waive [his] right to an attorney," to which defendant responded, "18 months ago." As the hearing progressed, defendant said nothing further about self-representation, although he did articulate a disagreement (without elaboration) with the prosecutor's description of his answers as indicating that he was currently satisfied with his attorneys but would file a motion to have them removed in the future if he was dissatisfied with them.

At a subsequent hearing in April 2019 where the trial court addressed motions concerning venue and pretrial release, the state brought up the matter from the earlier hearings regarding whether defendant was satisfied with his counsel or wanted to represent himself. The prosecutor recounted that defendant had not provided direct answers to the court's questions about whether he wanted to represent himself. The prosecutor further recalled that, when the

prosecutor was discussing the matter with defense counsel, defendant interjected that he had not answered the court's questions "because he felt like the issue had been set up for him to have a legitimate appellate issue based on the Court's original reasoning." The prosecutor asserted that "he's intentionally choosing not to answer that question because he likes the way the issue is framed now with the record we have for the—for the Supreme Court down the road." The court agreed: "Well, I think his whole goal is to make it murky, and I think it's been that way since day one, and it's entirely clear to me that the answers that he gives me to my questions from day one are designed to make it murky and to not really answer questions, so I don't see any sense in having any conversation with [defendant] going forward."

2.   *Arguments on appeal and analysis*

On appeal, defendant contends that the trial court's manner of dealing with what he describes as his unequivocal requests to represent himself was inadequate. He asserts that he unambiguously invoked his right to self-representation, and that the court erred in failing to conduct a colloquy with him to explain the risks and disadvantages of self-representation. To the extent that defendant's arguments—and the state's response—are about the prosecutor's later representations about defendant's intentions and the court's agreement that defendant's refusal to answer the court's questions were to make the matter of self-representation (or his dissatisfaction with counsel) "murky," that focus is misplaced. The focus is not on what defendant's unstated motives might have been for saying and doing what he did; the focus is on what was communicated—by the court and by defendant—about self-representation. With that in mind, we undertake an examination as to whether the trial court committed legal error in addressing the issues that defendant raised.

The right to represent oneself at trial is a counterpart to the right to be represented by counsel at trial. *State v. Hightower*, 361 Or 412, 416, 393 P3d 224 (2017). A waiver of the right to counsel is, in effect, an assertion of the right to proceed *pro se*. A waiver of the right to counsel

or the counterpart right to self-representation, like other waivers of constitutional rights, must be an intentional waiver of a known right. *State v. Meyrick*, 313 Or 125, 132, 831 P2d 666 (1992). An assessment of whether a waiver is intentional and knowing "will depend on the particular circumstances of each case, including the defendant's age, education, experience, and mental capacity; the charge (whether complicated or simple); the possible defenses available; and other relevant factors." *Id.* In determining whether a defendant is intentionally relinquishing a known right, the trial court "should focus on what the defendant knows and understands." *Id.* (Emphasis omitted.) To evaluate what a defendant knows and understands on this matter, the preferred means is a "colloquy" between the court and the defendant in which the court explains the dangers and disadvantages of self-representation. *Id.* at 133. However, a "catechism" is not required. *Id.* at 134. How a court chooses to address a defendant's request concerning self-representation is "subject to appellate review for an abuse of discretion." *Hightower*, 361 Or at 418.[11] As explained below, we conclude that the court did not abuse its discretion in addressing the self-representation issue as it arose in the proceedings before the trial court on retrial. That is because the requests were equivocal, confusing, and—at least at one point—conditioned on the court subjecting itself to a series of prepared interrogatories before defendant was even willing to say whether he wished to waive the right to counsel and proceed *pro se*. As described above, defendant's statements throughout the proceedings revealed that he already had extensive knowledge of the risks of self-representation when he implicitly chose to proceed with counsel by refusing

---

[11] The court further explained the standard of review:

"[A]lthough the trial court's decision in response to a request for self-representation is ordinarily a matter of discretion, in some cases, that decision may be predicated on certain subsidiary determinations—either findings of fact or conclusions of law—that trigger their own standards of review. So, for example, if a court's decision as to whether to grant a request for self-representation turns on the court's legal conclusions as to the scope of the right, that determination is reviewed for errors of law."

*Hightower*, 361 Or at 421 (citations omitted); *see also State v. Ashbaugh*, 317 Or App 767, 772, 505 P3d 1015 (2022) (reviewing a trial court's decision around the scope of the right of self-representation for legal error and the denial of the right of self-representation for an abuse of discretion).

to address the court's questions about whether he wished to represent himself.

As an initial matter, to the extent that defendant points to several places in the record where he specifically told the court that he wanted to represent himself and argues that he, therefore, made "unequivocal" requests, we reject defendant's contention. Whether or not a request is unequivocal must be evaluated in context. Here, each time defendant made what he now describes on appeal as an "unequivocal" request, he proceeded to equivocate about whether he did, in fact, want to represent himself. We understand defendant's position that his requests should be viewed as "unequivocal" as an attempt to try to distinguish this case from the situation in *State v. Brooks*, 301 Or App 419, 429, 456 P3d 665 (2019), *vac'd on other grounds*, 368 Or 168, 486 P3d 794 (2021), which held that where a defendant makes an equivocal request for self-representation, the court may defer consideration of it to have the defendant consult with counsel about the matter. In our view, *Brooks* supports a conclusion that defendant's requests in this case should not be viewed as unequivocal—or said differently, that defendant's requests in context were equivocal. We noted in *Brooks* that the defendant "made an initially unequivocal request for self-representation," but in light of the colloquy that followed where counsel agreed to talk to the defendant and have the matter considered again a few days later, "defendant's initial unequivocal invocation of his right to self-representation became an equivocal invocation." *Id.* at 427-28 (emphasis omitted). As described above, none of defendant's requests in this case were unequivocal; but, even if they were so viewed, the context of the proceedings shows that any request became an equivocal invocation.

On appeal, defendant further asserts, citing *State v. Miller*, 254 Or App 514, 295 P3d 158 (2013), and *State v. Music*, 305 Or App 13, 467 P3d 812 (2020), that because he made requests to represent himself, he triggered the trial court's "obligation" to "make the *Miller* inquiry," in which the court must determine whether the defendant's decision is made knowingly and intelligently. *Miller*, 254 Or App at 523-24. In essence, defendant argues that he uttered magic words

that triggered the court's obligation to provide him with a catechism on the dangers of self-representation. Defendant's argument misapprehends *Miller* and the *Meyrick* foundation on which it is laid.

In *Miller*, on the day before trial, the defendant explained that he wanted to hire a new lawyer who would not be available for trial the next day. 254 Or App at 521. The trial court told him he had three choices: proceed with current counsel, have his new lawyer ready to go to trial the next day, or represent himself. *Id.* The following day, counsel moved to withdraw, and the court noted that counsel had a great deal of experience and that an issue that the defendant attempted to raise *pro se* "shows me how little you know about these matters and that you're better in the hands of an experienced attorney." *Id.* at 521-22. The court therefore denied the motion to withdraw, the motion for a continuance, and the motion for self-representation "in your own best interest." *Id.* at 522. On appeal, we concluded that the defendant had clearly sought to invoke his right of self-representation and that the trial court erred, because "rather than establishing that defendant's waiver was knowing and intelligent, [the court] summarily denied defendant's request solely because it was in his 'best interest' to continue to be represented by his current defense counsel." *Id.* at 524 (emphasis omitted). The present case is not comparable factually in any significant way. As described above, defendant's request was not unequivocal like that in *Miller*, nor did the trial court treat defendant's request like the one in *Miller*.

Defendant also suggests that this case is comparable to *Music*, 305 Or App at 16, in which the defendant made multiple unequivocal requests to represent himself rather than have the court appoint a new attorney and also expressed frustration at the length of his pretrial detention and other pretrial matters, which the trial court interpreted "as a refusal to answer the court's questions about representation." We concluded that the request for self-representation was unambiguous and rejected the state's suggestion that the defendant was refusing to answer the court's questions, observing that, although the defendant was expressing

frustration with the trial court, the "frustration at the court refusing to acknowledge his request for self-representation cannot be a justification for the court's failure to acknowledge the request in the first instance." *Id.* at 19. We conclude that this case is readily distinguishable.

Although it is true that, like the defendant in *Music*, defendant in this case did refuse to directly answer the court's questions on numerous occasions, the similarities end there. The problem in *Music* was that the trial court "interpreted [the] defendant's discussion about waiving his preliminary hearing as a refusal to answer the court's questions about representation." *Id.* at 16. Here, by contrast, the court and defendant were not—for the most part—speaking at cross-purposes when they engaged in a discussion about the dangers of self-representation or whether defendant wished to proceed with counsel. Defendant informed the court that he felt that the court's form was not comprehensive enough in explaining the dangers of self-representation in his view of the case law on the subject. Defendant quoted case law to the court about self-representation and conditioned his answer to the court's questions about whether he wanted to represent himself on the court first doing what defendant requested, *viz.*, submit to a lengthy examination by defendant. Accordingly, *Music* does not assist defendant's arguments in this case.

The cases on which defendant relies do little to advance his arguments on appeal. In particular, rather than making anything like an explicit or unambiguous request to represent himself, defendant equivocated about whether, or how, or under what circumstances, he might or might not want to represent himself, including suggesting that he would make a decision only after being allowed to engage in an extensive examination of the trial judge. A review of the transcript leaves no doubt that defendant was aware that case law indicated that the preferred method of determining if an individual understands the risks of self-representation is for the court to engage in a colloquy with a defendant. Defendant's responses to the court's inquiries on whether he wished to represent himself or whether he was satisfied

to proceed with counsel were evasive at worst and far from clear at best.

It is true that the sort of colloquy described in *Meyrick* as the preferred means to ensuring that a defendant understands the pitfalls of self-representation did not occur here. Although a colloquy is identified as the "preferred" means of ensuring that a defendant understands the dangers of self-representation, it is not the only means. There are circumstances in which a court, dealing with a vacillating defendant, may conclude that it cannot successfully engage in such a colloquy. And we have little doubt that that was the case here: The court wanted defendant to provide a direct response to the inquiry about whether he wanted to represent himself or whether he wished to continue to be represented, and defendant's response was to propose a four-hour hearing to allow himself the opportunity to question the trial judge. The sort of colloquy contemplated in *Meyrick* and its progeny does not involve an open-ended questioning session in which defendants query judges about how to try their cases, and there would be significant dangers in engaging in such a process that could jeopardize an adequate defense. In short, the court did not err in declining to follow defendant's preferred course of action in addressing the issue.

We agree with defendant's contention that, to the extent that the court's comments could be understood to mandate a written request to waive counsel, the court would have been acting outside of its permissible range of discretion if it denied the request on that basis alone. That is, the parties have not cited any legal requirement—and we are not aware of any—that a request to waive counsel must be made in writing.[12] Nonetheless, even assuming that the court should not have told defendant that he needed to submit his request in writing, we conclude that that does not resolve the question presented. Our review of the

---

[12] The record does not contain the form that the court gave to defendant. However, it is clear from the record that the form explained some of the dangers of self-representation despite defendant's statements to the court that he did not believe that the form adequately described all the dangers of self-representation set forth in the case law as he understood it. We express no opinion on the content of that form.

circumstances before the trial court reveals that defendant knew of the dangers of self-representation, and the record further reflects that the court knew that defendant understood the dangers of self-representation and that defendant knowingly and voluntarily chose to proceed with counsel rather than proceed *pro se*.

A colloquy, as noted earlier, is not the only means to ensure that a defendant is aware of the dangers of self-representation. In some instances, the record can reflect that a defendant appreciates "the material risks of self-representation." *State v. Jackson*, 172 Or App 414, 423, 19 P3d 925 (2001) (observing that the *Meyrick* court's "no catechism" approach "explicitly disclaims such a formalistic approach"). In this case, when defendant told the court that he needed to be advised of the risks and dangers of self-representation, he revealed throughout those exchanges that he already had significant legal knowledge on the subject. For instance, he demonstrated that knowledge by asserting that the court was required to ensure that he knew of the risks and dangers of self-representation and opining that the court's waiver form did not adequately provide all of the information that, in his view, case law indicated should be provided to a defendant in this circumstance. "A record can reflect that the defendant sufficiently understands the material risks of self-representation in a number of ways." *State v. Lasarte*, 203 Or App 222, 224, 125 P3d 33 (2005); *see also Meyrick*, 313 Or at 132 n 8 (observing that "a defendant's knowledge and understanding of the right to counsel and of the dangers and disadvantages of self-representation may turn on things other than on what the court tells the defendant, such as the defendant's age, education, and experience and the complexity of the charges and possible defenses"). As we have observed, a defendant's "appreciation of the risks [of self-representation] must be grounded in the defendant's case; they cannot be general or abstract." *State v. Abbott*, 319 Or App 578, 582, 510 P3d 935 (2022). Here, defendant had knowledge of the charges and possible defenses—topics that had been extensively explored in *Johnson I*, *Johnson II*, and *Johnson III*.[13] His statements to the trial court demon-

---

[13]  We also note that defendant had an extensive history of litigation including both representation by counsel and self-representation, as shown in the following

strated that he had reviewed appellate case law concerning the dangers of self-representation. And, as the state notes, all of this happened long before the commencement of the trial.

The circumstances described in *Brooks*, 301 Or App at 428-29, involved a somewhat comparable situation where the defendant was equivocal about whether he wanted to represent himself, the trial was not imminent, and the trial court followed a similar approach to this case by deferring consideration of the issue to give the defendant an opportunity to discuss the matter with counsel. As described above, the court in this case initially gave defendant a week to discuss matters with counsel. Then, at a second hearing, the court again offered defendant more time to discuss it with counsel, but when the matter was eventually raised again in the context of a discussion of counsel's motion to withdraw, defendant declined to say anything more on the subject. In short, under the circumstances of this case, the court did not err in failing to engage more with defendant on the topic of the dangers of self-representation. The record demonstrates that defendant knowingly and voluntarily proceeded with representation by counsel rather than self-representation.

C.  *Law of the Case*

1.  *Introduction*

As described above, although the trial court considered and ruled on numerous issues before retrial, it declined to rule on some of defendant's suppression arguments, as well as his pretrial motion *in limine* to exclude under OEC 404(3) the prior bad acts testimony of the girls whom defendant had drugged in the past. The state argued, and the court agreed, that consideration of those issues on retrial was barred under the law of the case doctrine.

---

non-comprehensive list of defendant's endeavors: *Johnson v. Premo*, 355 Or 866, 868, 878, 333 P3d 288 (2014) (noting that defendant had "filed more than 100 *pro se* motions, totaling more than 6,000 single-spaced pages of argument," and holding that the court did not err in striking *pro se* motions when he was represented by counsel); *Johnson v. Premo*, 302 Or App 578, 461 P3d 985, *rev den*, 366 Or 569 (2020) (concerning *pro se* motions filed in the post-conviction case); *Johnson v. Doe*, 301 Or App 756, 459 P3d 271, *rev dismissed*, 366 Or 569 (2020) (concerning a *pro se* petition for writ of *habeas corpus*); *Johnson v. Premo*, 287 Or App 307, 403 P3d 547 (2017) (concerning *pro se* motions filed in the post-conviction case).

Before turning to the specific arguments raised on appeal, we begin with a description of the law of the case doctrine and its purpose, then address the question of its applicability in situations such as this, where a retrial is occurring long after the first trial due to an intervening judicial proceeding that resulted in a finding that a defendant received inadequate assistance of counsel at the first trial.

The law of the case doctrine was described succinctly in *State v. Pratt*, 316 Or 561, 569, 853 P2d 827, *cert den*, 510 US 969 (1993):

> "It is a general principle of law and one well recognized in this state that when a ruling or decision has been once made in a particular case by an appellate court, while it may be overruled in other cases, it is binding and conclusive both upon the inferior court in any further steps or proceedings in the same litigation and upon the appellate court itself in any subsequent appeal or other proceeding for review."

(Quoting *Simmons v. Wash. F. N. Ins. Co.*, 140 Or 164, 166, 13 P2d 366 (1932)). In *Pratt*, the issue arose because, in its initial opinion on appeal that had resulted in a reversal and remand, the court had considered, and rejected, an argument that the defendant's arrest had been unlawful. 316 Or at 568 (citing *State v. Pratt*, 309 Or 205, 216-17, 785 P2d 350 (1990)). After remand, the defendant had raised that issue again, following up on and developing an issue that the appellate court had mentioned that had not been raised in the initial motion to suppress. *Pratt*, 316 Or at 568-69. The court, however, concluded that the law of the case doctrine precluded reconsideration of that legal argument, given that the court had expressly considered the potential merits of the issue in the initial appeal and had rejected its applicability to the facts of the case. *Id. Simmons*, on which *Pratt* relied, appears to have concerned a somewhat similar situation—although not much detail was provided as to the issues involved, the court noted that "the facts in evidence upon both trials were substantially the same." *Simmons*, 140 Or at 166. Both *Pratt* and *Simmons* relied on other Oregon cases concerning the law of the case doctrine, which has a long jurisprudential history. *See*, *e.g.*, *State v. Keelen*, 106

Or 331, 336, 211 P 924 (1923) (rejecting sufficiency of evidence challenge based on law of the case doctrine because in the prior appeal "and upon testimony practically the same as that adduced here we held that there was sufficient evidence to take the case to the jury"); *Stager v. Troy Laundry Co.*, 41 Or 141, 142, 68 P 405 (1902) (explaining that, where evidence adduced in prior trial was the same "in all material respects" and "the identical question presented on this appeal that was contested and disposed of on the former," law of the case doctrine precluded reconsideration of question).

The law of the case doctrine is not absolute, particularly concerning issues involving a different factual record. *See Bloomfield v. Buchanan*, 14 Or 181, 184, 12 P 238 (1886) ("The law of the case does not apply to the facts, but only to the law. Therefore, when new and different facts are presented, requiring the application of a different rule of law from that applied on the former appeal, the court must apply the law to the new facts as they appear." (Emphasis omitted.)). As we have recognized, there are at least some situations where a change in the law shows the outer edges of the law of the case doctrine.

In *State v. Poston*, 309 Or App 377, 482 P3d 778 (2021), we concluded that the law of the case doctrine did not preclude us from reconsidering an issue that we decided in the earlier proceeding. That is, although we had previously rejected the defendant's challenge to nonunanimous jury verdicts in an earlier appeal by applying the then-controlling authority of *Apodaca v. Oregon*, 406 US 404, 92 S Ct 1628, 32 L Ed 2d 184 (1972), we concluded in a subsequent appeal that the law of the case doctrine did not preclude us from reconsidering that issue in light of the intervening decision of *Ramos v. Louisiana*, 590 US ___, 140 S Ct 1390, 206 L Ed 2d 583 (2020), which overruled *Apodaca* and established that the verdict the defendant sought to challenge was unconstitutional under the Sixth Amendment. *Poston*, 309 Or App at 379-84. In *Poston*, we recognized that the law of the case doctrine is a prudential one and that there existed a well-established exception to its application in situations involving "intervening, inconsistent, controlling authority," such as an intervening decision of the Supreme Court of the

United States. *See id.* at 381 (quoting Allan D. Vestal, *Law of the Case: Single-Suit Preclusion*, 1967 Utah L Rev 1, 6 (1967)). Similarly, in *State v. Metz*, 162 Or App 448, 454, 986 P2d 714 (1999), *rev den*, 330 Or 331 (2000), we noted that the doctrine is "essentially one of judicial economy and judicial discretion," and concluded that the doctrine did not bar the admissibility of certain evidence that had been deemed inadmissible in the initial appeal but was later made admissible by an intervening statutory change. With that background on the law of the case doctrine, we turn to the specified prior bad acts evidence at issue in this appeal.

### 2. *Prior bad acts evidence*

The parties here debate whether, or how, the law of the case doctrine applies in light of the court's determination in *Johnson I* that at the initial trial, the trial court had properly admitted evidence that "defendant habitually preyed on underage girls, taking them to nightclubs, providing them with alcohol and drugs," and "sexually abusing them while they were rendered unconscious by drugs that he had provided to them." 340 Or at 322. The court described that evidence as "powerful circumstantial evidence that defendant's sexual contact with [HF] occurred after he had drugged her, and that he took advantage of her incapacitated state." *Id.* at 339.

The question the court addressed was whether the evidence was admissible under OEC 404(3), which provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The court observed that the evidence did not qualify as *modus operandi* evidence, because it lacked a sufficiently distinctive methodology but concluded that it must (and did) "involve a method of incapacitation (administration of an intoxicating substance) that would support the narrow inference that the state seeks to draw from it—that sexual contact between [HF] and defendant occurred while [HF]

was incapacitated by morphine that defendant had administered." 340 Or at 340. The court concluded that "the witnesses' testimony was admissible for the noncharacter purpose of showing that [HF] did not consent and, in fact, was incapable of consenting to the sexual contact that she had with defendant." *Id.* To reiterate, the court in *Johnson I* concluded that defendant had a "method" of using morphine to sexually exploit girls, and that such evidence "permitted the jury to infer that [HF], like others, had not consented to the sexual contact with defendant that other evidence all but conclusively established had occurred." *Id.* at 341.

As defendant's argument correctly points out, that "consent" justification for the admission of this evidence was later disavowed. In *State v. Leistiko*, 352 Or 172, 282 P3d 857, *adh'd to as modified on recons*, 352 Or 622, 292 P3d 522 (2012), *abrogated in part by State v. Jackson*, 368 Or 705, 498 P3d 788 (2021), the court distanced itself from the statements in *Johnson I* that prior bad acts evidence is admissible to show whether a victim consented to sexual contact. In *Leistiko*, the court noted the "consent" language in *Johnson I* but explained that, viewed in context, the case should be read to stand for the narrower proposition that "the jury could infer from that evidence that the defendant had a plan or method for obtaining sexual access to women while they were incapacitated and acted pursuant to that plan." 352 Or at 181. That is, the relevance theory that justified the admission of that evidence was not that it showed whether HF consented to sexual contact (which would be squarely at odds with the holding in *Leistiko*) but that defendant had a "method" of drugging women. The *Leistiko* court went on to explain that its "method" ruling in *Johnson I* was consistent with a "plan" theory of admissibility "that a pattern of prior similar acts may be admissible to prove a plan or design." *Id.* at 188 (citing Wigmore, 2 *Evidence* § 304 at 249).

Thereafter, in *State v. Turnidge (S059155)*, 359 Or 364, 439, 374 P3d 853 (2016), *cert den*, ___ US ___, 137 S Ct 665 (2017), the court elaborated on the type of "plan" evidence described in *Leistiko* (and *Johnson*), describing that type of theory, as set forth in the Wigmore treatise, as "spurious plan" evidence, *viz.*, "prior bad act evidence offered to

show that a defendant engaged in a pattern or systematic course of conduct from which the existence of a plan is to be inferred." (Emphasis omitted.) The court in *Turnidge (S059155)*, however, ultimately concluded that the evidence at issue was not "spurious plan" evidence. *Id.* at 440.

In his opening brief on appeal, defendant argues that *Leistiko* shows that the court's stated rationale for admission of the evidence in *Johnson I* was incorrect and that *Turnidge (S059155)* also casts doubt on whether the evidence at issue in *Johnson I* was admissible "plan" evidence under OEC 404(3). We have little reason to doubt defendant's assertion that, if it were a matter of first impression, *Johnson I* would not be analyzed today the way it was in 2006.[14] The difficulty with defendant's argument, however, is that the court did not, in fact, disavow or overrule *Johnson I* in *Leistiko*, *Turnidge (S059155)*, or in any of its later cases explaining the limitations of propensity-based reasoning. The court did suggest in *Leistiko* and *Turnidge (S059155)* that the evidence described in *Johnson I* fit within what it eventually labelled the "spurious" rather than "true" plan theory of admissibility. Importantly, however, the court has not explicitly disavowed or overruled "spurious plan" as a possible theory of admissibility under OEC 404(3).[15] Thus, to the extent that defendant argues on

---

[14] We note, in particular, cases such as *State v. Skillicorn*, 367 Or 464, 479 P3d 254 (2021), and *State v. Jackson*, 368 Or 705, 498 P3d 788 (2021), provide insight into the court's current view of what it considers impermissible propensity-based reasoning for admission of prior bad acts evidence. *See*, *e.g.*, *Skillicorn*, 367 Or at 476 (explaining that prior bad acts evidence may not be used "to argue that the defendant has either a general propensity to engage in misconduct or a specific propensity to engage in misconduct like the charged crime and, therefore, it is more likely that the defendant committed the charged crime"); *id.* at 473 (noting that prior bad acts evidence cannot "be admitted under the doctrine of chances for the purpose of arguing that, because the defendant engaged in deliberate conduct before, it is likely that he engaged in it again during the charged incident"); *Jackson*, 368 Or at 730-32 (rejecting "doctrine of chances" argument that evidence of the defendant's DNA found at four different murder scenes was admissible to establish the defendant's identity as the culprit).

[15] Indeed, in *State v. Taylor*, 315 Or App 608, 622-23, 501 P3d 7 (2021), we upheld the admissibility of evidence on "spurious plan" theory, citing *Leistiko* and *Johnson I*, but our initial decision was vacated and remanded for reconsideration in light of *Jackson*. *State v. Taylor*, 369 Or 675, 508 P3d 501(2022). On remand from the Oregon Supreme Court, we applied *Jackson* and affirmed, concluding that the inferences the state advanced—unlinked or spurious plan—"did not require character reasoning to connect the other act to the charged act." *State v. Taylor*, 326 Or App 396, 408-09, 532 P3d 502, *rev allowed*, 371 Or 509 (2023).

appeal that the law of the case doctrine should not apply because of changes in the law, we conclude that the trial court was not faced with an "intervening, inconsistent, controlling decision by a higher court" that would require it to abandon the law of the case doctrine with respect to this evidence. *Poston*, 309 Or App at 383.[16] We conclude that, whatever merit there is to defendant's argument about substantive changes in the law concerning admissibility of prior bad acts evidence, it is an argument to be made before the Oregon Supreme Court.

Accordingly, we reject defendant's law of the case argument as it was presented by counsel in the opening brief. We note, however, that in his supplemental *pro se* brief, defendant makes an additional argument that also was made in the trial court. That argument—read generously—is that the law of the case doctrine should be inapplicable in a context such as this, where there has been a post-conviction proceeding that resulted in a finding that trial counsel had provided inadequate assistance to the defendant in the original trial. That is, defendant suggests that the law of the case doctrine should give way in light of the inadequate manner in which the original case was tried. In the abstract, that proposition appears to have some merit, although we are aware of no case law that has addressed this specific situation and defendant cites none.

As described above, the law of the case doctrine applies when the evidence is materially the same in a subsequent trial, and the same legal questions are presented. When there is a retrial after a successful post-conviction claim, it is certainly possible that neither the evidence nor

---

[16] We also note that, even if we were to conclude that *Leistiko*, *Turnidge (S059155)*, or other subsequent Oregon Supreme Court cases did implicitly or explicitly overrule *Johnson I*, it would not necessarily follow that the law of the case doctrine is inapplicable here. As noted above, the court in *Pratt* specifically cautioned that

> "when a ruling or decision has been once made in a particular case by an appellate court, while it may be overruled in other cases, it is binding and conclusive both upon the inferior court in any further steps or proceedings in the same litigation and upon the appellate court itself in any subsequent appeal or other proceeding for review."

316 Or at 569 (quoting *Simmons*, 140 Or at 166). Thus, whatever is to be made of the shifting or refinement of the OEC 404(3) analysis, *Pratt* informs us that the statements in *Johnson I* are "binding and conclusive" in this subsequent proceeding.

the legal questions in a subsequent appeal will be the same. And as defendant notes, we made a pertinent observation that relates to that subject in *Johnson II*. As described above, *Johnson II* and *Johnson III* concerned the inadequate assistance defendant received in the first trial due to counsel's failure to develop a drug-overdose theory of the case, and the state had appealed the post-conviction court's conclusion. On appeal, in upholding the post-conviction court's decision, we declined to consider defendant's (then petitioner's) assignments of error on cross-appeal in which he asserted that trial counsel had been inadequate in numerous other ways in his original trial. We explained:

> "Petitioner does not argue that any of his assignments of error on cross-appeal could provide relief different from the relief of a new criminal trial that the post-conviction court granted, and that we affirm. Moreover, we do not understand the court's denial of post-conviction relief on other claims to have any effect on the retrial of the case, or to preclude petitioner from relitigating any of the issues underlying those additional claims, which might arise in a different posture on retrial."

*Johnson II*, 277 Or App at 227 n 2. That footnote demonstrates our belief that issues from the first trial that defendant asserted had been handled inadequately by counsel might arise in a different posture on retrial, and that the court on retrial would not be precluded from considering them. Although that footnote was not specifically about the law of the case doctrine, the gravamen of our observation is consistent with that doctrine: If, on retrial, a factual or legal issue arises in a significantly different posture—and, in fact, was a subject of one of the inadequate assistance of counsel claims not reached by us in the post-conviction appeal—litigation of the issue on retrial would not be precluded. Importantly, however, the post-conviction claims that we did not reach in *Johnson II* did not concern counsel's handling of the OEC 404(3) issue at the first trial. Thus, regardless of whether that footnote suggests a possible limitation on the law of the case doctrine in this circumstance, the limitation it suggests is not implicated here.[17]

---

[17] We note that neither defense counsel's brief nor defendant's *pro se* brief actually argues that the differing evidence on retrial—evidence concerning

### 3.  *Suppression of evidence*

We address only briefly defendant's law of the case argument concerning one of his suppression motions. Again, we assume for the sake of argument that the exception to the law of the case doctrine concerning changes in the law is potentially applicable here. Defendant argues that the trial court erred in precluding him from relitigating an issue addressed in *Johnson I* concerning the search that revealed evidence that his computer had been used to access tide tables during the time between when HF went missing and when her body was found. More specifically, he argues, as he did in *Johnson I*, that his computers were seized and searched unlawfully. He asserts that relitigation of that issue is not barred by the law of the case doctrine, because *State v. Mansor*, 363 Or 185, 421 P3d 323 (2018), established new standards for warranted searches of computers. The gravamen of his argument is that his computer was searched based on an overly broad warrant under the new standards announced in *Mansor*. Even assuming that defendant's argument is correct about the breadth and depth of *Mansor*, nothing in *Mansor* calls into question the actual analysis of the computer-search issue in *Johnson I*. That is, defendant's argument seems to be premised on the notion that the court in *Johnson I* concluded that the trial court properly denied suppression because the warrant was valid. That is not the case.

In *Johnson I*, the court noted that the trial court had concluded that despite defects in the warrant that ultimately led to the discovery of the disputed evidence, "the evidence obtained from that search (*i.e.*, the tide table evidence) was admissible, because the state had 'purged the taint' of that unlawful search by showing that the tide table evidence inevitably would have been discovered." 340 Or at 327. The Supreme Court agreed with the trial court, concluding that the police "could have, and ultimately would have" obtained a valid warrant to search the computer

morphine as the potential cause of the victim's death (an issue that was not present in the first trial)—or the parties' newly-developed theories of the case to address the morphine issue means that the law of the case doctrine is inapplicable because the factual and legal issues are no longer identical. We therefore do not consider that issue.

and discovered the tide table evidence. *Id.* at 328 (footnote omitted). Thus, none of defendant's arguments concerning *Mansor* address the actual reason that the court in *Johnson I* concluded that suppression was properly denied, and *Mansor* did not address inevitable discovery. Accordingly, we conclude that *Mansor* does not assist defendant's argument that the law of the case doctrine is inapplicable under these circumstances.[18]

### D.  *Jury Concurrence*

On appeal, defendant argues that the trial court erred in failing to instruct the jury that it needed to concur on the manner in which defendant caused HF's death, and subsequently erred in denying his motion for a mistrial based on the same legal argument. As described above, on retrial, the state initially pursued the same theory of the case it had pursued in the first trial, *viz.*, that defendant had killed the victim by intentionally strangling her, and the state presented forensic evidence to support that theory. Defendant countered with evidence that the victim had a lethal amount of morphine in her system when she died and posited that the morphine caused her death. Thus, the issue as framed by the defense was whether the state had proved beyond a reasonable doubt that defendant had strangled the victim to death before she succumbed to the lethal overdose of morphine. And, as described above, the prosecutor remonstrated in the rebuttal closing argument that, even if the jury found that the victim died of an overdose of morphine, it could still find beyond a reasonable doubt that defendant intentionally killed her by giving her that overdose of morphine: "Whether you find the Defendant intentionally caused [HF]'s death by drugging her, intentionally caused [HF]'s death by strangling her, or intentionally caused [HF]'s death by a combination of the two, the fact remains that he did exactly what he intended to do."

Defendant did not object to the prosecutor's rebuttal argument at the time and he did not raise the matter of jury concurrence on the manner of death when the jury was instructed. Further, defendant did not object to the

---

[18]  Defendant does not argue that the inevitable discovery analysis would be affected by *Mansor*, and we therefore do not consider that issue.

court's receipt of the jury's guilty verdicts. Several days later, shortly before the sentencing phase of the trial commenced, defendant argued that the state had presented a new theory of the case in its rebuttal argument and asked the court to require the jury to undertake additional deliberations to determine whether the victim died by strangulation or by drug overdose. The court declined to do so, and defendant re-raised the issue in a motion for mistrial, which the trial court denied. After the conclusion of the penalty phase and the trial court's imposition of sentence, defendant filed a motion for a new trial that raised the same issue from his post-verdict motion for a mistrial, which the trial court also denied.

Defendant's argument that the jury was required to concur on what caused the victim's death finds its origins in *State v. Boots*, 308 Or 371, 380-81, 780 P2d 725 (1989), which observes that jurors must concur on specified aspects of an offense to return a valid verdict. As the court explained in *State v. Pipkin*, 354 Or 513, 516-17, 316 P3d 255 (2013), there are two situations in which the jurors must concur—or the state must elect the basis on which it is proceeding—where a statute defines a crime and specifies alternative ways in which it can be committed or where there is evidence of distinct occurrences.

Defendant contends that the present case falls within the latter category, *viz.*, evidence of distinct occurrences, asserting that this case resembles *State v. Rolfe*, 304 Or App 461, 468 P3d 503 (2020), where the state added a new factual theory of the case during rebuttal argument. In *Rolfe*, we concluded that the trial court erred in failing to require election or to instruct the jury that it needed to concur on whether the defendant violated a stalking protective order by sending the message after being served with notice of the order or, instead, if the message had been sent before the defendant had notice of the order as the defendant claimed, through the omission of failing to withdraw the previously sent message after receiving the order. *Id.* at 468. On appeal in this case, the state responds that a factual-concurrence jury instruction would not have been appropriate, because such instructions are limited to situations

where there is evidence of "multiple, separate occurrences" of a crime. Because the crime in this case was murder, and it was impossible for defendant to have killed the victim multiple times, the state reasons that how defendant killed the victim was not an essential matter on which the jury needed to concur, likening the cause of death to the location where a crime occurred. *See State v. Sparks*, 336 Or 298, 317, 83 P3d 304, *cert den*, 543 US 893 (2004) ("Nothing about the crimes charged in this case demonstrates that the precise location of the underlying crimes constitutes a material element of those crimes on which the jury must agree unanimously."). Although this could present an interesting issue, particularly in light of the court's statements in *Johnson III*, 361 Or at 700, that it viewed how HF died as "one of the most crucial facts" at issue, we need not reach it given the procedural posture.

First, defendant does not seek plain-error review of this issue. Rather, he contends that he preserved the matter by raising it (1) when, several days after the jury returned guilty verdicts, he asked the court to resubmit the case to the jury; (2) in his mistrial motion; and (3) in his motion for a new trial.[19] As explained below, we conclude that defendant did not adequately preserve in a timely manner most of his arguments for our review and what is preserved is outside the permissible scope of appellate review.

First, defendant cites no authority for the proposition that a court is required to send a jury out for additional deliberations after the court has accepted its verdicts. As we understand it, defendant suggests that the court was obligated to require the jury to return to its deliberations several days after the court had received the verdicts. Implicit in his argument is that, if the jurors did not in fact reach concurrence on the manner of death, the verdicts that the court had received without objection were defective. The difficulty with his position is that the verdicts received by the court were not invalid, and defendant cites no authority for his implicit proposition that they were defective in the absence of a jury-concurrence instruction. We therefore

---

[19] Defendant also appears to be asserting that he raised the issue in a pretrial demurrer concerning a motion to elect. On review of the record, however, we conclude that his motion did not raise that issue.

reject defendant's argument that the court erred in failing to set aside the verdict and reconvene the guilt-phase jury to deliberate and attempt to reach concurrence on the manner of the victim's death.

Second, as for the motion for a mistrial, the procedural options for what a court can do after receiving a verdict are limited. *See State ex rel Penn v. Norblad*, 323 Or 464, 470, 918 P2d 426 (1996) (discussing post-verdict procedures); *State ex rel Haas v. Schwabe*, 276 Or 853, 856, 556 P2d 1367 (1976) ("the only post-verdict motions authorized by statute in criminal cases are motions for a new trial and motions in arrest of judgment"). Our decision in *State v. Vogh*, 179 Or App 585, 41 P3d 421 (2002), is instructive. In that case, the court failed to administer an oath to the jury, and the defendant did not bring the matter to the court's attention until after the verdict had been received. *Id.* at 587. There—as in this case—the court declined to set aside the verdict and reconvene the jury and also denied a motion for a mistrial. Although we questioned whether the court had the authority to reconvene the jury in that circumstance, we ultimately concluded that, because the defendant's request for relief came too late, the court correctly denied it. *Id.* at 589-90. As for the defendant's motion for a mistrial, the "motion for mistrial at that late stage is untimely." *Id.* at 591 (citing cases). The same timing problem exists here. Moreover, even assuming that the court did have the authority to grant a mistrial for this type of asserted error, this is not a situation in which it would be an abuse of discretion to deny the motion for a mistrial given the timing of the motion. We assume that defendant's argument is correct that, until the prosecutor clearly made this an issue in rebuttal argument, defendant had no reason to anticipate the need for a jury-concurrence instruction. Those circumstances do not explain, however, why defendant could not or did not raise the issue when the prosecutor made that rebuttal argument, when the jury was being instructed, or at least some time before the jury returned its verdict.

Third, as for the motion for a new trial, defendant's argument runs into ORS 138.105(4)(a), which limits the scope of appellate review for any denial of a motion for a

new trial to either juror misconduct or newly discovered evidence. *See*, *e.g.*, *State v. Alvarez-Vega*, 240 Or App 616, 619, 251 P3d 199, *rev den*, 350 Or 297 (2011) (so concluding based on *former* ORS 138.040 (2015), *repealed by* Or Laws 2017, c 529, § 26, which is the predecessor statute to ORS 138.105). We therefore do not address defendant's arguments concerning denial of his motion for a new trial. In short, because they are either insufficiently preserved or outside the permissible scope of our appellate review, we reject defendant's jury concurrence arguments.

E.  *Sentencing under ORS 163.107*

As noted above, shortly before trial, the legislature enacted ORS 163.107, setting forth the offense of first-degree murder. Under that statute, several offenses that previously had been classified as aggravated murder (and which included the death penalty as a potential sentence) became first-degree murder (which does not include the death penalty as a potential sentence). Defendant was tried under the first-degree murder statute and, after the jury returned guilty verdicts, defendant was sentenced pursuant to the new statute to life without the possibility of parole. Defendant makes several arguments concerning the sentencing provisions of ORS 163.107, as well as other arguments related to his sentence. We reject without discussion all of those arguments save one. As explained below, we address whether ORS 163.107 and other sentencing provisions, as written or as applied in the present case, run afoul of the Sixth Amendment under *Apprendi v. New Jersey*, 530 US 466, 120 S Ct 2348, 147 L Ed 2d 435 (2000), and *Blakely v. Washington*, 542 US 296, 124 S Ct 2531, 159 L Ed 2d 403 (2004), and affirm.

The legislature enacted ORS 163.107 shortly before this case went to trial, which had the effect of changing this from an aggravated murder case—where the death penalty was a possible sentence—to a first-degree murder case—where the possible sentences are life with the possibility of parole and life without the possibility of parole. When originally tried, defendant was sentenced to death for aggravated murder pursuant to ORS 163.150, based on a jury's affirmative answers to questions such as whether the murder

was committed deliberately with a reasonable expectation of causing death, whether the killing was unreasonable in response to provocation by the victim, and whether, in light of mitigating and aggravating evidence, a defendant should receive the death penalty. ORS 163.150(1). By contrast, ORS 163.107(2) provides:

> "(a)   Except as otherwise provided in ORS 163.155 [which relates to a pregnant victim and is not applicable in this case] and paragraph (b) of this subsection, the court shall sentence a person convicted of murder in the first degree, who was at least 15 years of age at the time of committing the murder, to life imprisonment. The court shall order that the defendant be confined for a minimum of 30 years without possibility of parole or release to post-prison supervision except as provided in ORS 144.397, and without the possibility of release on work release or any form of temporary leave or employment at a forest or work camp.

> "(b)   The court may sentence the person to life imprisonment without the possibility of parole if the person was at least 18 years of age at the time of committing the murder. The court shall state on the record the reasons for imposing the sentence."

Thus, the default sentence for first-degree murder under subsection (2)(a) is life imprisonment for a minimum of 30 years. Under subsection (2)(b), however, the "court may sentence" a defendant to "life imprisonment without the possibility of parole," but only if the defendant is at least 18, and if the court "state[s] on the record the reasons for imposing the sentence." There is no explicit provision for empaneling a jury to make factual findings in support of the imposition of a life without parole sentence.

In a pretrial motion, defendant asserted that the provision in ORS 163.107(2)(b) for imposing a sentence greater than life with the possibility of parole was constitutionally infirm because, in his view, it authorizes an enhanced sentence based on facts found by the court, rather than by a jury. As defendant noted, under *Apprendi*, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 US at 490. The pertinent "statutory maximum"

for purposes of *Apprendi* "is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict." *Blakely*, 542 US at 303 (emphasis omitted). Defendant argued that, because subsection (2)(b) did not provide for fact-finding by a jury, it was unconstitutional.

The state remonstrated that a sentencing jury could be empaneled pursuant to ORS 136.760 through ORS 136.792 to find enhancement facts and indicated that the state would seek jury findings of several such facts (including those that were ultimately found by the jury), derived from the state's felony sentencing guidelines.[20] The state argued that, given the preference for construing statutes to be constitutional, ORS 163.107 should be viewed as operating in conjunction with ORS 136.760 through ORS 136.792 to allow for a sentencing jury to find facts upon which a court could base its reasons for imposing an enhanced sentence under ORS 163.107(2)(b). The trial court agreed and, as noted, the jury found sentence enhancement facts including that: Defendant knew or had reason to know of the victim's particular vulnerability; prior sanctions had not deterred him from re-offending; he was on supervision at the time of the offense; future efforts to rehabilitate him would not be successful; and there was a need to ensure the security of the public. Thereafter, the court indicated that defendant was at least 18 years of age and gave as its reasons for imposing a sentence of life without parole including the four enhancement facts found by the sentencing jury.

On appeal, defendant advances two principal arguments as to why sentencing under ORS 163.107 does not comport with the rules announced in *Apprendi* and *Blakely*. His primary argument, as noted earlier, is that ORS 163.107 contains no language that authorizes a trial court to use ORS 136.760 through ORS 136.792, which were enacted to ensure compliance with *Apprendi/Blakely*, when determining whether the enhanced sentence of life without parole should be imposed. Thus, he asserts, it was impermissible for the court in this case to use that statutory

---

[20] ORS 136.760 through ORS 136.792 were enacted shortly after the *Blakely* decision to remedy the previously-authorized judicial factfinding of sentence enhancement facts. Or Laws 2005, ch 463. They are discussed in more detail below.

framework to have the jury make findings of enhancement facts. Defendant also makes a secondary argument that the enhanced sentence may be imposed only "if the person was at least 18 years of age at the time of committing the murder," and, as he observes, whether he was 18 years old at the time of committing the murder was not submitted to the sentencing-phase jury.

We turn first to defendant's latter argument relating to his age at the time of the murder. His argument is cursory, and he cites no authority to support the argument that this is an enhancement fact that must be found by a jury beyond a reasonable doubt. The state contends that the requirement that a defendant be at least 18 years of age to be sentenced to life without parole is not an enhancement fact. In the state's view, the requirement is an exemption for those under 18 years of age that merely recognizes the constitutional principle from *Montgomery v. Louisiana*, 577 US 190, 136 S Ct 718, 193 L Ed 2d 599 (2016), that sentencing a juvenile to life without parole would be, in almost all circumstances, a violation of the Eighth Amendment to the United States Constitution. The state argues that this situation is similar to the situation addressed in *State v. Agee*, 358 Or 325, 364, 364 P3d 971 (2015), *adh'd to as modified on recons*, 358 Or 749, 370 P3d 476 (2016), where the court rejected an argument that, because the Eighth Amendment precluded a death sentence for an intellectually disabled defendant, the defendant was entitled to a jury finding as to whether he had an intellectual disability. The court explained: "[B]ecause intellectual disability is a fact that operates to reduce rather than to increase the maximum punishment permitted by a verdict of guilt, the Sixth Amendment does not require the fact of intellectual disability to be decided by a jury beyond a reasonable doubt." *Id.* Thus, in the state's view, age or youth, like intellectual disability, is essentially a mitigating factor rather than an aggravating factor. Defendant replies that the structure of the statute does not support that age or youth be used as a mitigating factor from what otherwise would be the presumptive sentence for adults. Rather, in defendant's view, the default sentence here is life with the possibility of parole as specified in ORS 163.107(2)(a).

Although Oregon does not appear to have a case directly on point, some other state courts have generally agreed with defendant's position. *See*, *e.g.*, *State v. Hernandez*, 294 Kan 200, 207, 273 P3d 774, 779 (2012) (concluding that, where defendant's age of 18 or older was an element of enhanced offense, it was error under *Apprendi* and *Blakely* not to submit an age question to the jury). *But see Perritte v. State*, 912 So 2d 332, 334-35 (Fla 5th Dist Ct App 2005) (concluding that it was not reversible error under *Apprendi* not to submit the question of age to the jury where the statute for enhanced punishment applied to defendants 18 years of age or older and undisputed evidence in record established the defendant's age). Importantly, however, even the courts that take the position defendant urges us to adopt recognize that such an error may well be harmless. *See Hernandez*, 294 Kan at 208, 273 P3d at 779 ("When the trial record shows evidence of age that was overwhelming and essentially uncontroverted, the failure to give the jury an instruction on the element of age * * * may be harmless."); *see also Washington v. Recuenco*, 548 US 212, 126 S Ct 2546, 165 L Ed 2d 466 (2006) (holding that the failure to submit a sentencing factor to the jury under *Apprendi* is not structural error and is subject to a harmless-error analysis). Thus, assuming without deciding that defendant is correct that the question of his age should have been submitted to the sentencing jury, we conclude that any error in that regard is harmless beyond a reasonable doubt.

We reach that conclusion for several reasons. First, there was uncontradicted evidence that defendant provided numerous teenaged girls with alcohol before the murder occurred, suggesting that he was old enough to purchase it, and that those girls referred to him as a "troll," a term that they used for adult men who pursued teenaged girls. Second, and more importantly, references were made during the trial to the fact that defendant was 42 years old at the time of the murder, with no suggestion that that description was inaccurate. Third, numerous exhibits were presented by the defense in this case, including copies of official records, which contained his date of birth in 1956. Finally, defendant was originally tried and convicted of aggravated murder, he received the death penalty, and that penalty was upheld on

appeal. At that point in time, the death penalty not only was prohibited under the Eighth Amendment for juveniles but also was prohibited by Oregon law for juveniles. *See generally Roper v. Simmons*, 543 US 551, 125 S Ct 1183, 161 L Ed 2d 1 (2005) (so holding); *Engweiler v. Board of Parole*, 343 Or 536, 175 P3d 408 (2007) (detailing the history of juvenile aggravated murder sentencing under Oregon law). Given that information, we conclude that, even assuming defendant's argument is correct that the trial court erred in failing to submit the question of defendant's age to the sentencing jury, that error was harmless beyond a reasonable doubt given all the evidence before the jury that would have led it to conclude that he met the age threshold for the trial court to impose the sentence that it did in this case.

We now turn to defendant's primary argument that ORS 163.107(2)(b) runs afoul of *Apprendi*—more specifically, the provisions of ORS 163.107(2)(b) that "[t]he court may sentence the person to life imprisonment without the possibility of parole" and "shall state on the record the reasons for imposing the sentence." In our view, those provisions give a trial court discretion to impose an enhanced sentence—rather than a sentence of life with the possibility of parole—and require the court to give "the reasons for imposing the sentence." Those provisions do not, however, contain any explicit limitation on judicial factfinding to bring the statute within the confines of the rules announced in *Apprendi* and *Blakely* that, with certain exceptions, reasons for imposing an enhanced sentence must be submitted to a jury and found beyond a reasonable doubt. Because the statutory framework does not specifically call for factfinding by a jury, defendant posits that it must provide for judicial factfinding, which cannot be reconciled with the requirements of *Apprendi* and *Blakely*. We do not understand defendant to be arguing that the reasons the trial court gave for imposing the enhanced sentence in this case were not found by the jury. As noted above, the court empaneled a sentencing jury that found beyond a reasonable doubt the enhancement facts on which the court later relied. Rather, we understand defendant's argument to be focused on the statutory framework that does not provide explicitly for empaneling a jury to make those findings in cases involving first-degree

murder, and therefore the sentence could not be constitutionally applied to him. We reject defendant's argument.

As we have often observed, "[i]t is axiomatic that we should construe and interpret statutes in such a manner as to avoid any serious constitutional problems." *State v. Alvarado*, 257 Or App 612, 621, 307 P3d 540 (2013) (citations and internal quotation marks omitted); *see also Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 US 568, 575, 108 S Ct 1392, 99 L Ed 2d 645 (1988) (explaining that, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress"). Defendant does not argue that the legislature, in enacting ORS 163.107 to decrease the penalties for certain murder offenses, intended a constitutionally infirm statute that required judicial factfinding at sentencing contrary to the requirements set forth in *Apprendi* and *Blakely*. Rather, we understand defendant's argument to be more along the lines that ORS 163.107 simply is irreconcilable with the other statutory provisions that conform Oregon's sentencing practices with the requirements of *Apprendi* and *Blakely*, because, as defendant observes, ORS 163.107(2)(b) does not cross-reference those other statutory provisions and requires the court, not the jury, to state the reasons for imposing the enhanced sentence.

To the extent that defendant is implying that *Blakely* and *Apprendi* require the jury to make the decision whether to impose an enhanced sentence, we reject that argument. The jury must find the facts on which an enhanced sentence is based, and the actual sentencing decision remains with the court to impose. Said differently, if a sentencing framework allows the court to decide whether to impose an enhanced sentence after a jury makes the requisite findings that an enhancement fact or facts exist, that does not run afoul of *Blakely* and *Apprendi*, because the court is not finding facts in that circumstance—the jury is. Oregon's sentencing framework provides for just that.

As noted above, the legislature enacted ORS 136.760 through ORS 136.792 specifically in response to *Blakely*.

Nowhere in those statutes is there any textual indication that they would not apply to sentencing on newly created offenses such as first-degree murder under ORS 163.107. Indeed, those statutes are written very broadly. For example, ORS 136.760(2) defines an "enhancement fact" simply as one "that is constitutionally required to be found by a jury in order to increase the sentence that may be imposed upon conviction of a crime." The provisions for submitting those issues to a jury—ORS 136.770, ORS 136.773, and ORS 136.792—similarly are crafted in such a way that a trial court may empanel a jury to find enhancement facts in any situation in which jury findings of enhancement facts are required to impose an enhanced sentence. Importantly, ORS 136.785(5) provides that "[n]otwithstanding the findings made by a jury relating to an enhancement fact, the court is not required to impose an enhanced sentence." *See also* ORS 137.080 (providing that a court may consider evidence of aggravation or mitigation in imposing sentence in accordance with felony sentencing guidelines); OAR 213-008-0001 (providing that a court shall state on the record the reasons for imposing a departure sentence); ORS 161.735 (providing that, after jury finds dangerous offender enhancement facts, court may choose to sentence defendant as dangerous offender).

When ORS 163.107(2)(b) is viewed in the context of those related statutes that apply generally to sentencing practices, it becomes evident that the statutes work together harmoniously in a manner that results in a constitutional sentence: A jury is empaneled—should the defendant choose to have sentence enhancement facts found by a jury—under ORS 136.770 or 136.773. If the jury finds enhancement facts proven beyond a reasonable doubt, ORS 136.785(2), the court may then, under ORS 163.107(2)(b) and ORS 136.785(5), choose to impose an enhanced sentence and, in so doing, it must state on the record the jury-found enhancement facts it is relying on to impose the enhanced sentence.

In sum, the procedure followed here by the trial court for submitting enhancement facts to the jury during sentencing and the court's imposition of an enhanced sentence based on those facts comport with both the statutes

described above and with the requirements of *Apprendi* and *Blakely*.

## IV.   CONCLUSION

For the foregoing reasons, we conclude that neither defendant's convictions nor his sentence are infirm in the ways that he posits on appeal.

Affirmed.